## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| PHILLIP KRAFT, Individually and on Behalf of all others similarly situated, | Case No: |
| 324 Olive Avenue<br>Horsham, Pennsylvania 19044 | |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v . | JURY TRIAL DEMANDED |
| UNDER ARMOUR, INC.,<br>1020 Hull Street<br>3rd Floor<br>Baltimore, MD 21230 | |
| KEVIN A. PLANK,<br>c/o Under Armour, Inc.<br>1020 Hull Street<br>3rd Floor<br>Baltimore, MD 21230 | |
| PATRIK FRISK,<br>c/o Under Armour, Inc.<br>1020 Hull Street<br>3rd Floor<br>Baltimore, MD 21230 | |
| DAVID E. BERGMAN,<br>c/o Under Armour, Inc.<br>1020 Hull Street<br>3rd Floor<br>Baltimore, MD 21230 | |
| and | |
| LAWRENCE "CHIP" MOLLOY,<br>c/o Under Armour, Inc.<br>1020 Hull Street<br>3rd Floor<br>Baltimore, MD 21230 | |
| Defendants. | |

Plaintiff Phillip Kraft ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, public filings, wire and press releases published by and regarding Under Armour, Inc. ("Under Armour" or the "Company"), and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired Under Armour securities between August 3, 2016 and November 1, 2019, inclusive (the "Class Period").  Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the Company is headquartered in this judicial

district and the alleged misstatements entered the market and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Under Armour securities during the Class Period and was economically damaged thereby.

7.      Defendant Under Armour purports to develop, market, and distribute branded performance apparel, footwear, and accessories for men, women, and youth.  In addition, the Company also purports to offer accessories, which include gloves, bags, and headwear; and digital fitness subscriptions, as well as digital advertising through MapMyFitness, MyFitnessPal, and Endomondo platforms.

8.      Under Armour is incorporated in Maryland and its principal executive office is located at 1020 Hull Street, Baltimore, Maryland.  Under Armour's securities trade on the New York Stock Exchange ("NYSE") under the ticker symbols "UA" (Class C Stock) and "UAA" (Class A Stock).

9.      Defendant Kevin A. Plank ("Plank") served as the Company's Chief Executive Officer ("CEO") and Chairman during the Class Period.  He is also the founder of Under Armour.

10.      Defendant Patrik Frisk ("Frisk") served as the Company's Chief Operating Officer ("COO") and President during the Class Period.

11.     Defendant David E. Bergman ("Bergman") served as the Company's Chief Financial Officer ("CFO"), principal accounting officer, and principal financial officer during part of the Class Period.

12.     Defendant Lawrence "Chip" Molloy ("Molloy") served as the Company's CFO, principal accounting officer, and principal financial officer during part of the Class Period.

13.     Defendants Plank, Frisk, Bergman, and Molloy are collectively referred to herein as the "Individual Defendants."

14.     Each of the Individual Defendants:

    (a)     directly participated in the management of the Company;

    (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

    (c)     was privy to confidential proprietary information concerning the Company and its business and operations;

    (d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    (e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    (f)     was aware of or recklessly disregarded the fact that false and misleading statements were being issued concerning the Company; and/or

    (g)     approved or ratified these statements in violation of the federal securities laws.

15.     Under Armour is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.     The scienter of the Individual Defendants and other employees and agents of the

Company is similarly imputed to Under Armour under *respondeat superior* and agency principles.

17.     Defendants Under Armour and the Individual Defendants are collectively referred

to herein as "Defendants."

### SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

18.     On August 3, 2016, the Company filed its quarterly report on Form 10-Q with the

SEC for the quarter ended June 30, 2016 (the "2Q 2016 10-Q").  The 2Q 2016 10-Q was signed

by Defendant Molloy.  Attached to the 2Q 2016 10-Q were certifications pursuant to the Sarbanes-

Oxley Act of 2002 ("SOX") signed by Defendants Plank and Molloy attesting to the accuracy of

the financial statements and the disclosure of all fraud.

19.     The 2Q 2016 10-Q stated, in pertinent part, the following about revenue

recognition:

> Historically, we have recognized a majority of our net revenues and a significant
> portion of our income from operations in the last two quarters of the year, driven
> primarily by increased sales volume of our products during the fall selling season,
> including our higher priced cold weather products, along with a larger proportion
> of higher margin direct to consumer sales. The level of our working capital
> generally reflects the seasonality and growth in our business.

20.     The 2Q 2016 10-Q stated the following about internal controls over financial

reporting:

> *Evaluation of Disclosure Controls and Procedures*
>
> Our management has evaluated, under the supervision and with the participation of
> our Chief Executive Officer and Chief Financial Officer, the effectiveness of our
> disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and
> 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange
> Act")) as of the end of the period covered by this report. Based on that evaluation,
> our Chief Executive Officer and Chief Financial Officer have concluded that our
> disclosure controls and procedures are effective in ensuring that information

5

required to be disclosed in our Exchange Act reports is (1) recorded, processed, summarized and reported in a timely manner and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

*Changes in Internal Controls*

There has been no change in our internal control over financial reporting as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) during the most recent fiscal quarter that has materially affected, or that is reasonably likely to materially affect our internal control over financial reporting.

21.     A Company press release on October 25, 2016 entitled "UNDER ARMOUR REPORTS THIRD QUARTER NET REVENUES GROWTH OF 22%; REITERATES FULL YEAR NET REVENUES OUTLOOK OF $4.925 BILLION" announced in pertinent part:

Net revenues increased 22% in the third quarter of 2016 to $1.47 billion compared with net revenues of $1.20 billion in the prior year's period. On a currency neutral basis, net revenues increased 23% compared with the prior year's period.

22.     The October 22, 2016 press release also included Defendant Plank specifically noting Under Armour's ongoing focus on its 20-plus quarter streak of "at least 20% net revenue growth."

23.     On November 2, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2016 (the "3Q 2016 10-Q"). The 3Q 2016 10-Q was signed by Defendant Molloy. Attached to the 3Q 2016 10-Q were SOX certifications signed by Defendants Plank and Molloy attesting to accuracy of the financial statements and the disclosure of all fraud.

24.     The 3Q 2016 10-Q stated, in pertinent part, the following about revenue recognition:

Historically, we have recognized a majority of our net revenues and a significant portion of our income from operations in the last two quarters of the year, driven primarily by increased sales volume of our products during the fall selling season,

including our higher priced cold weather products, along with a larger proportion of higher margin direct to consumer sales. The level of our working capital generally reflects the seasonality and growth in our business.

25. The 3Q 2016 10-Q stated the following about internal controls over financial reporting:

*Evaluation of Disclosure Controls and Procedures*

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective in ensuring that information required to be disclosed in our Exchange Act reports is (1) recorded, processed, summarized and reported in a timely manner and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

*Changes in Internal Controls*

There has been no change in our internal control over financial reporting as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) during the most recent fiscal quarter that has materially affected, or that is reasonably likely to materially affect our internal control over financial reporting.

26. A Company press release on January 31, 2017 entitled "UNDER ARMOUR REPORTS FOURTH QUARTER AND FULL YEAR RESULTS; ANNOUNCES OUTLOOK FOR 2017" provided a "Full Year 2016 Review" which stated:

- **Revenues** increased 22 percent to $4.8 billion (up 23 percent currency neutral) including a 19 percent increase in wholesale revenues to $3.1 billion and a 27 percent increase in direct-to-consumer revenues which reached $1.5 billion. Direct-to-consumer revenues reached 31 percent of total revenues compared with 30 percent in 2015. North American revenues grew 16 percent and international revenues grew 63 percent (up 69 percent currency neutral). For the full year, international revenues represented 15 percent of total revenues, compared with 11 percent in 2015. Apparel revenues increased 15 percent to $3.2 billion led by growth in golf, basketball and training. Footwear revenues grew 50 percent to reach $1 billion driven by balanced growth across all

categories with particular strength in running and basketball. Accessories revenues increased 17 percent to $407 million with strength in bags and headwear and Connected Fitness increased 51 percent to $80 million.

- **Gross margin** was 46.5 percent compared with 48.1 percent as benefits from more favorable product costs were offset by efforts to manage inventory, changes in foreign currency and the outperformance of the footwear and international businesses in the overall mix, which carry lower margins than the apparel and North American businesses.
- In line with revenue growth, full year **selling, general and administrative** expenses grew 22 percent and reached $1.8 billion, or 37.8 percent of revenues.
- **Operating income** increased 3 percent to $420 million and **net income** grew 11 percent to $259 million. **Diluted earnings per share** for full year 2016 were $0.45 per share for Class A and B shares and $0.71 per share for Class C shares, reflecting the impact of a $59 million stock dividend paid to Class C shareholders during the second quarter. If the Class C stock dividend had not been paid, non-GAAP diluted earnings per share for all classes for 2016 would have been $0.58 per share. This compares with diluted earnings per share of $0.53 for all classes in 2015.

27.    On February 23, 2017, the Company filed its annual report on Form 10-K with the SEC for the year ended December 31, 2016 (the "2016 10-K").  The 2016 10-K was signed by Defendants Plank and Bergman.  Attached to the 2016 10-K were SOX certifications signed by Defendants Plank and Bergman attesting to accuracy of the financial statements and the disclosure of all fraud.

28.    The 2016 10-K stated, in pertinent part, the following about revenue recognition:

Historically, we have recognized a majority of our net revenues and a significant portion of our income from operations in the last two quarters of the year, driven primarily by increased sales volume of our products during the fall selling season, including our higher priced cold weather products, along with a larger proportion of higher margin direct to consumer sales. The level of our working capital generally reflects the seasonality and growth in our business. We generally expect inventory, accounts payable and certain accrued expenses to be higher in the second and third quarters in preparation for the fall selling season.

\* \* \*

*Revenue Recognition*

Net revenues consist of both net sales and license and other revenues. Net sales are recognized upon transfer of ownership, including passage of title to the customer and

transfer of risk of loss related to those goods. Transfer of title and risk of loss are based upon shipment under free on board shipping point for most goods or upon receipt by the customer depending on the country of the sale and the agreement with the customer. In some instances, transfer of title and risk of loss take place at the point of sale, for example at our brand and factory house stores. We may also ship product directly from our supplier to the customer and recognize revenue when the product is delivered to and accepted by the customer. License revenues are primarily recognized based upon shipment of licensed products sold by our licensees. Sales taxes imposed on our revenues from product sales are presented on a net basis on the consolidated statements of income and therefore do not impact net revenues or costs of goods sold.

We record reductions to revenue for estimated customer returns, allowances, markdowns and discounts. We base our estimates on historical rates of customer returns and allowances as well as the specific identification of outstanding returns, markdowns and allowances that have not yet been received by us. The actual amount of customer returns and allowances, which is inherently uncertain, may differ from our estimates. If we determine that actual or expected returns or allowances are significantly higher or lower than the reserves we established, we would record a reduction or increase, as appropriate, to net sales in the period in which we make such a determination. Provisions for customer specific discounts are based on contractual obligations with certain major customers. Reserves for returns, allowances, markdowns and discounts are recorded as an offset to accounts receivable as settlements are made through offsets to outstanding customer invoices. As of December 31, 2016 and 2015, there were $146.2 million and $94.5 million, respectively, in reserves for customer returns, allowances, markdowns and discounts.

29.     The 2016 10-K stated the following about internal controls over financial reporting:

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures as of December 31, 2016 pursuant to Rule 13a-15(b) under the Securities Exchange Act of 1934 (the "Exchange Act"). Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of December 31, 2016, our disclosure controls and procedures are effective in ensuring that information required to be disclosed in our Exchange Act reports is (1) recorded, processed, summarized and reported in a timely manner and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Refer to Item 8 of this report for the "Report of Management on Internal Control over Financial Reporting."

There has been no change in our internal control over financial reporting during the most recent fiscal quarter that has materially affected, or that is reasonably likely to materially affect our internal control over financial reporting.

30.     On February 28, 2018, the Company filed its annual report on Form 10-K with the SEC for the year ended December 31, 2017 (the "2017 10-K").   The 2017 10-K was signed by Defendants Plank and Bergman.   Attached to the 2017 10-K were SOX certifications signed by Defendants Plank and Bergman attesting to accuracy of the financial statements and the disclosure of all fraud.

31.     The 2017 10-K stated, in pertinent part, the following about revenue recognition:

Historically, we have recognized a majority of our net revenues and a significant portion of our income from operations in the last two quarters of the year, driven primarily by increased sales volume of our products during the fall selling season, including our higher priced cold weather products, along with a larger proportion of higher margin direct to consumer sales. The level of our working capital generally reflects the seasonality and growth in our business. We generally expect inventory, accounts payable and certain accrued expenses to be higher in the second and third quarters in preparation for the fall selling season.

\* \* \*

*Revenue Recognition*

Net revenues consist of both net sales and license and other revenues. Net sales are recognized upon transfer of ownership, including passage of title to the customer and transfer of risk of loss related to those goods. Transfer of title and risk of loss are based upon shipment under free on board shipping point for most goods or upon receipt by the customer depending on the country of the sale and the agreement with the customer. In some instances, transfer of title and risk of loss take place at the point of sale, for example at our brand and factory house stores. We may also ship product directly from our supplier to the customer and recognize revenue when the product is delivered to and accepted by the customer. License revenues are primarily recognized based upon shipment of licensed products sold by our licensees. Sales taxes imposed on our revenues from product sales are presented on a net basis on the consolidated statements of income and therefore do not impact net revenues or costs of goods sold.

We record reductions to revenue for estimated customer returns, allowances, markdowns and discounts. We base our estimates on historical rates of customer returns and allowances as well as the specific identification of outstanding returns, markdowns and allowances that have not yet been received by us. The actual amount of customer returns and allowances, which is inherently uncertain, may differ from our estimates. If we determine that actual or expected returns or allowances are

significantly higher or lower than the reserves we established, we would record a reduction or increase, as appropriate, to net sales in the period in which we make such a determination. Provisions for customer specific discounts are based on contractual obligations with certain major customers. Reserves for returns, allowances, markdowns and discounts are recorded as an offset to accounts receivable as settlements are made through offsets to outstanding customer invoices. As of December 31, 2017 and 2016, there were $246.6 million and $146.2 million, respectively, in reserves for customer returns, allowances, markdowns and discounts.

32.     The 2017 10-K stated the following about internal controls over financial reporting:

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective in ensuring that information required to be disclosed in our Exchange Act reports is (1) recorded, processed, summarized and reported in a timely manner and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

*Changes in Internal Controls*

\* \* \*

There have been no changes in our internal control over financial reporting as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) during the most recent fiscal quarter that have materially affected, or that are reasonably likely to materially affect our internal control over financial reporting.

33.     On February 25, 2019, the Company filed its annual report on Form 10-K with the SEC for the year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Plank and Bergman. Attached to the 2018 10-K were SOX certifications signed by Defendants Plank and Bergman attesting to accuracy of the financial statements and the disclosure of all fraud.

34.     The 2018 10-K stated, in pertinent part, the following about revenue recognition:

Historically, we have recognized a majority of our net revenues and a significant portion of our income from operations in the last two quarters of the year, driven primarily by increased sales volume of our products during the fall selling season, including our higher priced cold weather products, along with a larger proportion of higher margin direct to consumer sales. The level of our working capital generally reflects the seasonality and growth in our business. We generally expect inventory, accounts payable and certain accrued expenses to be higher in the second and third quarters in preparation for the fall selling season.

\* \* \*

*Revenue Recognition*

We recognize revenue pursuant to Accounting Standards Codification 606 ("ASC 606"). Net revenues consist of net sales and license and Connected Fitness revenue. Net sales are recognized upon transfer of control, including passage of title to the customer and transfer of risk of loss related to those goods. Payment is due in full when title is transferred. Transfer of title and risk of loss is based upon shipment under free on board shipping point for most goods or upon receipt by the customer depending on the country of the sale and the agreement with the customer. In some instances, transfer of title and risk of loss takes place at the point of sale, for example, at our brand and factory house stores. We may also ship product directly from our supplier to the customer and recognize revenue when the product is delivered to and accepted by the customer. License revenue is primarily recognized based upon shipment of licensed products sold by our licensees. Sales taxes imposed on our revenues from product sales are presented on a net basis on the consolidated statements of income, and therefore do not impact net revenues or costs of goods sold.

We record reductions to revenue at the time of the transaction for estimated customer returns, allowances, markdowns and discounts. We base these estimates on historical rates of customer returns and allowances as well as the specific identification of outstanding returns, markdowns and allowances that have not yet been received by us. The actual amount of customer returns and allowances, which are inherently uncertain, may differ from our estimates. If we determine that actual or expected returns or allowances are significantly higher or lower than the reserves we established, we would record a reduction or increase, as appropriate, to net sales in the period in which we make such a determination. Provisions for customer specific discounts are based on contractual obligations with certain major customers. Reserves for returns, allowances, markdowns and discounts are included within customer refund liability and the value of inventory associated with reserves for sales returns are included within prepaid expenses and other current assets on the consolidated balance sheet. As of December 31, 2018 there were $301.4 million in reserves for returns, allowances, markdowns and discounts within customer refund liability and $113.9 million as the estimated value of inventory associated with the reserves for sales returns within prepaid expenses and other

current assets on the consolidated balance sheet. As of December 31, 2017, there were $246.6 million in reserves for customer returns, allowances, markdowns and discounts within accounts receivable, net.

35.     The 2018 10-K stated the following about internal controls over financial reporting:

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective in ensuring that information required to be disclosed in our Exchange Act reports is (1) recorded, processed, summarized and reported in a timely manner and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. The Company's internal control over financial reporting as of December 31, 2018 has been audited by PricewaterhouseCoopers LLP, as stated in their report which appears herein.

*Changes in Internal Controls*

\* \* \*

There have been no changes in our internal control over financial reporting as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) during the most recent fiscal quarter that have materially affected, or that are reasonably likely to materially affect our internal control over financial reporting.

36.     The statements contained in ¶¶ 18-35 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Under Armour shifted sales from quarter to quarter to appear healthier, including to keep pace with their long-running year-over-year 20% net revenue growth; (ii) undisclosed to the investing public, the Company had been under investigation by and cooperating with the U.S. Department of Justice ("DOJ") and U.S. Securities and Exchange Commission ("SEC") since at least July 2017; and (iii) as a result, Defendants' statements about its business,

operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Begins to Emerge

37.     On November 3, 2019, the *Wall Street Journal* reported on DOJ and SEC investigations into Under Armour's accounting practices and related disclosures.  The article, entitled "Under Armour Is Subject of Federal Accounting Probes," noted that the investigations concerned whether Under Armour shifted sales from quarter to quarter to appear healthier.

38.     That same day, the Company confirmed to the *Wall Street Journal* that it had been cooperating with the DOJ and SEC since July 2017.

39.     On this news, Class C shares of Under Armour (symbol: UA) fell $3.47 per share, or 18.35%, to close at $15.44 per share, and Class A shares of Under Armour (symbol: UAA) fell $4.00 per share, or 18.92%, to close at $17.14 per share, on November 4, 2019, damaging investors.

40.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

41.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired Under Armour securities during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of Under Armour, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which officers or directors of the Company have or had a controlling interest.

42.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Under Armour securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

43.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

44.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

45.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of Under Armour;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether Defendants caused Under Armour to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Under Armour securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

46.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

47.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, in that:

- Under Armour shares met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- As a public issuer, Under Armour filed periodic public reports;

- Under Armour regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Under Armour's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- Under Armour was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

48.     Based on the foregoing, the market for Under Armour securities promptly digested current information regarding Under Armour from all publicly available sources and reflected such information in the prices of Under Armour shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

49.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

50.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

51.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

52.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Under Armour securities during the Class Period.

54.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Under Armour were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These Defendants by virtue of their receipt of information reflecting the true facts of Under Armour, their control over, and/or receipt and/or modification of Under Armour's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Under Armour, participated in the fraudulent scheme alleged herein.

55.    The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Under Armour personnel to members of the investing public, including Plaintiff and the Class.

56.     As a result of the foregoing, the market price of Under Armour securities was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Under Armour securities during the Class Period in purchasing Under Armour securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

57.     Had Plaintiff and the other members of the Class been aware that the market price of Under Armour securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Under Armour securities at the artificially inflated prices that they did, or at all.

58.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

59.     By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for the substantial damages that they suffered in connection with their purchases of Under Armour securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

60.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

61.     During the Class Period, the Individual Defendants participated in the operation and management of Under Armour, and conducted and participated, directly and indirectly, in the

conduct of Under Armour's business affairs.  Because of their senior positions, they knew the adverse non-public information about Under Armour's misstatement of revenue and profit and false financial statements.

62.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Under Armour's financial condition and results of operations, and to correct promptly any public statements issued by Under Armour that had become materially false or misleading.

63.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Under Armour disseminated in the marketplace during the Class Period concerning Under Armour's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Under Armour to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Under Armour within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Under Armour securities.

64.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Under Armour.

## **PRAYER FOR RELIEF**

 **WHEREFORE**, Plaintiff, on behalf of Plaintiff and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)      awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)      awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  December 9, 2019

Respectfully submitted,

/s/ Daniel S. Sommers
Steven J. Toll (Md. Bar No. 15824)
Daniel S. Sommers (Md. Bar No. 15822)
S. Douglas Bunch*
**COHEN MILSTEIN SELLERS &
    TOLL PLLC**
1100 New York Avenue N.W.
Suite 500, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: stoll@cohenmilstein.com
        dsommers@cohenmilstein.com
        dbunch@cohenmilstein.com

*Liaison Counsel for Plaintiff*

**POMERANTZ LLP**

Jeremy A. Lieberman*
J. Alexander Hood II*
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
        ahood@pomlaw.com

**POMERANTZ LLP**

Patrick V. Dahlstrom*
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
  & GROSSMAN, LLC**

Peretz Bronstein*
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Counsel for Plaintiff*

*(*Pro hac vice forthcoming)*

**Submission Date**

2019-11-07 11:39:47

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.    I  make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against Under Armour, Inc. (UA; UAA) or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire Under Armour securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Under Armour securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Under Armour securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct.

## Name

**Print Name**

Phillip Kraft

**Signature**



**Full Name**

Phillip Kraft

**Under Armour, Inc (UAA)**                                              **Kraft, Phillip**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 10/18/2016 | Purchase | 24 | $38.1000 |